TRACY L. WILKISON
United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
DAVID T. RYAN (Cal. Bar No. 295785)
Assistant United States Attorney
Terrorism and Export Crimes Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-4491
    Facsimile: (213) 894-2979
    E-mail:   david.ryan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. ED CR 20-246-JGB |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING DEFENDANT NIZAR FARHAT |
| v. | |
| NIZAR FARHAT, | |
| Defendant. | |

    Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney David T. Ryan, hereby files its sentencing position regarding defendant NIZAR FARHAT.

///

///

This sentencing position is based upon the attached memorandum of points and authorities, the presentence investigation report, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: December 6, 2021         Respectfully submitted,

                                          TRACY L. WILKISON
                                        United States Attorney

                                        CHRISTOPHER D. GRIGG
                                        Assistant United States Attorney
                                        Chief, National Security Division

                                               /s/
                                        DAVID T. RYAN
                                        Assistant United States Attorney

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant was a public official entrusted with a security clearance and responsible for implementing multi-million-dollar infrastructure projects on an overseas United States military base. He played a critical role in advising the Department of Defense to certify the completion of those projects, and to approve millions of dollars of payments to private contractors. Instead of faithfully executing his position of public trust, defendant repeatedly abused it. Over more than two years, he took $37,000 in secret cash payments in casinos and hotel rooms in exchange for using his position and influence to convince the Department of Defense to pay a contractor nearly $4.2 million in taxpayer dollars.

As a result of his corrupt conduct, defendant was charged and pleaded guilty to receipt of illegal gratuities and illegal compensation by a public official, in violation of Title 18, United States Code, Sections 201(c)(1)(B), 209(a), and 216(a)(2). The USPO calculated defendant's Guidelines level as 14, his criminal history category as I, and his sentencing range as 15-21 months. (PSR at 4.) The government agrees with the USPO's calculations.

Due to the serious and repeated nature of defendant's abuse of his position of public trust, and the substantial public interest in deterring similar acts of public corruption, the government submits that a custodial sentence is necessary. The government also submits, however, that defendant's personal history and circumstances, including the health issues documented in the PSR, are significant mitigating factors that warrant a downward variance from the Guidelines range. Accordingly, the government respectfully

recommends that the Court vary downward from the Guidelines by one level, and impose the following sentence: (1) 12 months' imprisonment with six months to be served in custody and six months to be served in home detention; (2) three years' supervised release; (3) a $75,000 fine; and (4) a special assessment of $200.

## II.  STATEMENT OF FACTS

Between November 2009 and February 2018, defendant worked for the Department of Defense as a Construction Manager based at the Marine Corps Air Ground Combat Center, Twentynine Palms Base, Twentynine Palms, California.  (PSR ¶ 10.)  In May 2013, a privately held construction company based in Massachusetts, "U.S. Company #1," was awarded a $15 million contract by the United States Navy to construct an aircraft hangar and a telecommunications facility at the United States Navy Base at Camp Lemonnier, Djibouti City, Republic of Djibouti ("Camp Lemonnier").  (Id. ¶ 11.)  Between June 2014 and December 2015, defendant was assigned a temporary duty to Camp Lemonnier to oversee, among other responsibilities, U.S. Company #1's construction of the aircraft hangar and telecommunications facility.  (Id. ¶ 12.) In April 2016, the Department of Defense certified that U.S. Company #1 had completed the construction of the aircraft hangar and telecommunications facility at Camp Lemonnier.  (Id. ¶ 13.)  In April 2017, U.S. Company #1 submitted Requests for Equitable Adjustment ("REAs") to the Department of Defense, seeking $6.43 million in payments from the Department of Defense for additional costs U.S. Company #1 incurred during the construction of the aircraft hangar and telecommunications facility.  (Id. ¶ 14.)

Between December 2015 and October 2017, defendant covertly and corruptly received cash payments from the president of U.S. Company

#1 on four separate occasions in exchange for: (1) recommending that the Department of Defense certify the completion of U.S. Company #1's projects at Camp Lemonnier; (2) drafting the REAs that U.S. Company #1 submitted to the Department of Defense; and (3) recommending that the Department of Defense approve and pay the REAs that U.S. Company #1 submitted.  (Id. ¶¶ 16-17.)

Defendant received the first cash payment on December 18, 2015.  On that date, defendant met with the President of U.S. Company #1 at a hotel in Las Vegas, Nevada and accepted at least $15,000 in cash from the President of U.S. Company #1.  (Id. ¶ 19.)

Defendant received the second payment on June 10, 2016.  On that date, defendant met with the President and Vice President of U.S. Company #1 at a hotel in Las Vegas, Nevada.  During the meeting, defendant reviewed drafts of the REAs and advised the U.S. Company #1 representatives on how to revise them.  Following that meeting, defendant accepted approximately $10,000 in cash from the President of U.S. Company #1.  (Id. ¶ 20.)

Between June and November 2016, defendant provided advice on multiple occasions by phone to employees of U.S. Company #1 as they continued to draft the REAs.  (Id. ¶ 21.)

Defendant received the third payment on November 2, 2016.  On that date, defendant met again with the President and Vice President of U.S. Company #1 at a hotel in Palm Springs, California.  During the meeting, defendant reviewed revised drafts of the REAs and advised the U.S. Company #1 representatives on how to revise them.  Following that meeting, defendant accepted approximately $5,000 in cash from the President of U.S. Company #1.  (Id. ¶ 22.)

U.S. Company #1 submitted the REAs in April 2017 and the Department of Defense began to review them in September 2017. (Id. ¶ 23.) In September and October 2017, defendant participated in conference calls with other Department of Defense officials involved in the review of the REAs regarding the validity of the REAs, and provided written reports to those officials in which he recommended that they approve approximately $4.17 million of the $6.43 million that U.S. Company #1 had requested. (Id. ¶ 24.)

Defendant received the fourth payment on October 24, 2017. On that date, defendant met with the President and Vice President of U.S. Company #1 at a hotel in Las Vegas. During the meeting, defendant discussed the Department of Defense's review of the REAs and advised the President and Vice President of U.S. Company #1 that the Department of Defense would likely offer U.S. Company #1 approximately $4.2 million. Following that meeting, defendant accepted approximately $7,000 in cash from the President of U.S. Company #1. (Id. ¶ 25.)

In November and December 2017, defendant sent additional emails to Department of Defense officials involved in the review of the REAs to encourage them to promptly offer to pay U.S. Company #1 approximately $4.17 million to resolve the REAs. Defendant did not disclose to the Department of Defense that he had participated in drafting the REAs or that he had accepted cash payments from U.S. Company #1. (Id. ¶ 26.)

### III. SENTENCING GUIDELINES CALCULATION

The government agrees with the USPO's Guidelines calculations. The base offense level is 11 pursuant to U.S.S.G. § 2C1.2. (PSR ¶¶ 35-37.) A two-level enhancement applies pursuant to U.S.S.G.

4

§ 2C1.2(b)(1) because defendant received multiple illegal payments. (Id. ¶ 38.) A four-level enhancement applies pursuant to U.S.S.G. § 2C1.2(b)(2) because defendant received between $15,000 and $40,000 (specifically, $37,000) in illegal payments. (Id. ¶ 39.) A three-level decrease for acceptance of responsibility applies pursuant to U.S.S.G. § 3E1.1(a), (b), because defendant clearly and timely accepted responsibility. (Id. ¶¶ 45-46.) The total offense level is therefore 14. The criminal history category is I. Accordingly, the government agrees with the USPO that the applicable Guidelines sentencing range is 15 to 21 months' imprisonment, one to three years' supervised release, and a $7,500 to $75,000 fine. (Id. at 4.)

For the reasons set forth below, the government submits that a one-level downward variance is warranted, which would reduce the total offense level to 13, reduce the sentencing range to 12-18 months, and move defendant from Zone D of the Sentencing Table into Zone C. Under the Guidelines, if the applicable guidelines range is in Zone C, a within-Guidelines term of imprisonment may be satisfied by a sentence of imprisonment that includes a term of supervised release with a condition that substitutes home detention, provided that at least one-half of the minimum term is satisfied by imprisonment. U.S.S.G. § 5C1.1(d)(2).

## IV. SENTENCING RECOMMENDATION

### A. Nature, circumstances, and seriousness of the offense warrant a custodial sentence

Public corruption is not a victimless crime. When a public official abuses his position of public trust and uses his influence over the disbursement of taxpayer money to enrich himself rather than the public good, he not only robs the taxpayers of the services to

which they are entitled, he undermines the public's trust in its government. Defendant here repeatedly abused his ability to influence the payment of millions of taxpayer dollars in order to line his own pockets. The Guidelines properly account for the seriousness of his conduct through the application of enhancements for the receipt of multiple and substantial illegal payments.

Indeed, defendant did not merely suffer a momentary lapse in judgment. He carried out his corrupt scheme for more than two years, accepting payments in four separate meetings, with numerous phone calls, emails, and other communications in between. And he did not just take the cash; he followed through on his end of the bargain, secretly working with U.S. Company #1 to prepare their requests for payments, and then repeatedly imploring the Department of Defense to pay nearly $4.2 million to U.S. Company #1. In doing so, he corrupted the Department's internal review process, posing as a neutral advisor to his colleagues, themselves public officials entrusted with responsible stewardship of taxpayer dollars who believed they could trust defendant's recommendations, never knowing that he had taken thousands of dollars of cash to abuse that trust.

In light of the sustained, corrupt, and deceitful nature of defendant's crimes, the government submits that a custodial sentence is necessary. See 18 U.S.C. § 3553(a)(1), (2)(A).

**B.   General deterrence is particularly important in public corruption cases and warrants a custodial sentence**

A custodial sentence is also necessary to afford adequate general deterrence. Courts have identified why general deterrence is uniquely important in cases of public corruption. "General deterrence comes from a probability of conviction and significant

consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized. This country depends on honest representative democracy and, while our system is imperfect, it does not generally suffer from widespread corruption. Its proper functioning requires elected officials to serve the common good, not illicit personal gain. . . . Without meaningful consequences for a breach of trust, their trust is no more than blind trust." United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015).

Congress too has recognized that deterrence is a crucial factor in sentencing for public corruption and economic crimes such as this one. See S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing importance of "the deterrence of white-collar crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

Furthermore, not only is general deterrence a critical goal in public corruption and economic cases, courts have recognized it is also a particularly effective sentencing tool in such cases. This is because those who commit such crimes often premeditate their conduct and engage in cost-benefit analysis. See United States v. Martin,

7

455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."). Defendant's crimes here fall squarely within the type of conduct Congress and courts target for general deterrence.

While a custodial sentence in this case will serve as a deterrent to public officials who would abuse their positions of trust, a non-custodial sentence will not. "The threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir. 2009); see also United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir. 2013) ("We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence."). Accordingly, the need to afford general deterrence strongly counsels in favor of a custodial sentence.

**C. Need to promote respect for the law, and to provide just punishment warrant a custodial sentence**

In reaching an appropriate sentence, this Court must consider "the seriousness of the offense and its harm to the reputation of honest public servants and the public faith in legitimate . . . government." Morgan, 635 F. App'x 423, 448. Congress has recognized that in major white-collar cases, probation has been granted "without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt

8

of just punishment accorded by incarceration were of critical importance." S.Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75. Defendant's repeated abuse of his position of public trust and his corruption of the government's review of a multi-million-dollar claim is a serious crime that shows a lack of respect for the law and warrants meaningful punishment. Accordingly, these factors counsel in favor of a custodial sentence, as well as the government's recommended fine of $75,000, which is at the high end of the Guidelines and approximately twice the amount that defendant illegally obtained through his crimes.

**D. History and characteristics of the defendant are both aggravating and mitigating**

Defendant's personal history and characteristics present both aggravating and mitigating factors. Defendant has no criminal convictions prior to this case. He promptly accepted responsibility and pled guilty in this case and has expressed remorse for his crimes. As the USPO notes, he has been married for several decades, has a long record of employment, and has for years provided financial and other support to his wife as well as other family members who have experienced significant health challenges. (PSR ¶¶ 60-73). Defendant also has experienced and continues to experience health difficulties. (Id. ¶¶ 83-86.)

At the same time, to the extent defendant's financial difficulties played a role in this case, those difficulties were primarily the result of his gambling habit, rather than his support for his family. As the USPO notes, defendant visited Palm Springs casinos (including the casinos where he received the illegal payments in this case) hundreds of times in 2016 and 2017, losing over

9

$112,000.[1]  Accordingly, while the government submits that the mitigating factors in defendant's personal history and characteristics warrant a one-level variance, as well as a split sentence substituting six months of home detention for incarceration, the government maintains that the totality of the circumstances require imposition of a custodial sentence.

### E. A custodial sentence will avoid unwarranted sentencing disparities

Finally, the government's recommended sentence, which is at the low end of the Guidelines range after a one-level downward variance, will avoid unwarranted sentence disparities between this defendant and other similarly-situated defendants.  See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity,' . . . ."); United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007) ("Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing . . .").

## V.  CONCLUSION

For the foregoing reasons, the government recommends the Court impose the following sentence: 12 months' imprisonment, with six months in custody and six months in home detention; three years of supervised release; a $75,000 fine; and a special assessment of $200.

---

[1] Defendant appears to have minimized his gambling habit, telling the USPO that he gambled "every couple of weeks" with $500 or $600.  (PSR ¶ 86.)  The casino records noted by the USPO show that he gambled far more frequently (nearly three times per week), with far more money (losing over $112,000 in two years).  (Id. ¶ 87.)